**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**


DUWAYNE HARLEY BRYANT,             )
                                            )
            Plaintiff,                   )
                                            )
v.                                         )     Case No. 08-CV-22-GKF-FHM
                                            )
CP KELCO a/k/a CP KELCO U.S., INC.,   )
                                            )
            Defendant.           )


## OPINION AND ORDER

Before the court is defendant CP Kelco's Motion for Summary Judgment. [Dkt. #60].

This is an action for age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. and state public policy (*Burk* tort). Plaintiff was employed by CP Kelco at its Okmulgee, Oklahoma, facility until March 25, 2010, when he began a disability leave from his employment.

Plaintiff asserts that in May 2004, when he had the title of Warehouse Coordinator, his supervisor began discriminating against him; he was then assigned different duties and three individuals in their thirties assumed the tasks of Warehouse Coordinator. Plaintiff alleges the younger workers were given more compensation and/or hours than plaintiff and were not subjected to the same forms of discipline as plaintiff. He filed a charge of age discrimination with the Oklahoma Human Rights Commission ("OHRC") on October 2, 2004. He filed additional charges with the OHRC on February 17, 2005, July 14, 2006, June 15, 2009, and October 29, 2009, alleging age discrimination or retaliation.

In his original Complaint filed January 14, 2008, plaintiff asserted only one claim for age discrimination. [Dkt. #2]. Plaintiff has since amended his complaint three times [Dkt. ##30, 310, 26] and now asserts four causes of action:

> **Count I**—age discrimination with respect to terms of employment and/or a condition or privilege of employment, in violation of the ADEA (relating to a confrontation between plaintiff and his then-supervisor, John LaChance, on May 18, 2004);

> **Count II**—An adverse employment action after he complained on June 13, 2006, about unlawful discipline (relating to an oral and written reprimand by plaintiff's then supervisor, Patty Van Meter);

> **Count III**—An adverse employment action after he complained about unlawful discipline on April 1, 2009 (relating to a safety violation by plaintiff); and

> **Count IV**—State law *Burk* tort claim based on illegal age discrimination and retaliation in violation of Oklahoma public policy.

> Defendant seeks summary judgment on all of plaintiff's claims.

## I. Material Facts

1. CP Kelco owns and operates a plant in Okmulgee, Oklahoma, that produces Xanthan gum. [Dkt. #60, Ex. A, Tony Young Affid., ¶2].

2. Bryant, who was born in 1952, was employed by CP Kelco at the Okmulgee facility. [Dkt. #46, Third Amended Complaint, ¶1; Dkt. #60, Ex. B, Duwayne Bryant Dep., 57:25-58:2].

3. Due to a serious medical condition, Bryant has been unable to work since he began a disability leave from employment with CP Kelco on March 25, 2010. [Dkt. #60, Ex. A, Young Affid., ¶4]. Due to the medical condition, it is unlikely that he will ever be able to work again. [*Id.*, Ex. B, Bryant Dep., 140:12-19].

4. From December 1, 2002 through the last day that he worked at CP Kelco, Bryant was represented by the International Union of Operating Engineers Local No. 627, AFL-CIO ("Union"). [*Id.*, Ex. C, Trey Glidden Affid., ¶¶1-2; Exs. 14-15 to Ex. B, Bryant Dep.].

5.  Under the terms of the collective bargaining agreements between CP Kelco and the Union ("CBAs"), plaintiff's employment classification was "Operator II."  [Dkt. #60, Glidden Affid., ¶2].  Among other things, the CBAs determine an Operator II's hourly wage rates, vacation, holidays, personal time, 401(k), pension, disability insurance and life and accidental death insurance benefits. [*Id.*].

6.  From December 1, 2002, until Bryant could no longer work, he was paid in accordance with the terms of the CBAs and did not receive a reduction in pay or benefits.  [*Id.*, Glidden Affid.*, ¶3].[1]

7.  The CBAs also contain an extensive "Grievance and Arbitration Procedure" which may be utilized by represented employees who wish to complain of alleged unfair or illegal company actions.  [*Id.*, Glidden Affid., ¶4].

### John LaChance

8.  John LaChance ("LaChance") is a mechanical engineer who worked for CP Kelco at the Okmulgee plant from 1998 until June of 2008.  [Dkt. #60, Ex. D, John LaChance Affid., ¶¶1, 9].

9.  On March 1, 2004, LaChance became the Packaging Area Lead at the facility, which is a supervisory position.  [*Id.*, ¶1].

10.  Shortly after LaChance became the Packing Area Lead, Bryant moved to the Warehouse Coordinator position in the Packaging Department and began reporting to LaChance.  [*Id.*, Ex. B, Bryant Dep., 174:18-175:15].

11.  On Tuesday, May 18, 2004, an altercation occurred between LaChance and Bryant.  In his affidavit, LaChance states he approached Bryant about pallets that were out of place in the

---

[1] As set forth in Fact #19, *infra,* plaintiff contends that he suffered an involuntary reduction in hours and loss of overtime pay after the confrontation with LaChance.

warehouse the previous day (Monday, May 17, 2004). According to LaChance, Bryant stated, in response, that he did not have time to move the pallets on Monday. LaChance responded that there was no need for the Warehouse Coordinator position "if we cannot keep the warehouse organized," and Bryant responded, "Then do away with the job." [Dkt. #60-4, Ex. D, LaChance Affid., ¶3A]. LaChance states he "addressed the performance issue on May 18 with Bryant because I believed that it was the responsibility of the Warehouse Coordinator to make sure that items were in their proper places," and "any discussions I initiated with Bryant regarding his performance or duties was motivated by my desire to make sure that the responsibilities associated with the Warehouse Coordinator position were satisfactorily performed." [*Id.,* ¶3B]. Additionally, he states: "Bryant is not the only employee I have supervised and spoken to about job performance. I have advised other employees, who I believe to be younger than Bryant, of what I believed to be their unsatisfactory performance and my expectations that they need to improve their performance." [*Id.,* ¶4].

12. Bryant contests this, claiming LaChance has treated younger employees less harshly, and he has submitted the affidavits of coworkers Sam Parker, Garland Benton and Johnny Crabtree in support of this position [Dkt. #66, Exs. C, D, and E].

13. Parker, who worked for C.P. Kelco from April 1997 to July 2010, described Bryant as a "conscientious and hard worker who helped out his co-workers," stated that LaChance, "by my observation, had a personal vendetta against DuWayne Bryant" and "once told me that he wanted to run off DuWayne Bryant from C.P. Kelco." [Dkt. #66, Ex. C, ¶¶4-6]. Parker also stated, "Trey Glidden (Human Resources Manager), by my observation, also wanted to run DuWayne Bryant off from C.P. Kelco," and "threatened Bryant repeatedly with a loss of his job." [*Id.,* ¶7]. Additionally, he states, "DuWayne Bryant was therefore removed from his

warehouse position.[2] After removal, Bryant was sent to several other departments, in attempt to get him to quit." [*Id.,* ¶8]. Parker claims "Bryant was ultimately placed in re-blend, in an effort to put him in the most difficult area in the plant, with the worst working conditions," and "was then assigned more physically challenging work than the other, younger employees in the area." [*Id.,* ¶¶9-10].

14. Benton, who worked for C.P. Kelco from July 25, 1988 to April 2010, when he retired, worked in the same department with Bryant for several years and described him as "a hard worker with above average skills." [Dkt. #66, Ex. D, Benton Affid., ¶5]. He stated "LaChance was difficult supervisor to deal with. LaChance treated Bryant less favorably than he did other younger co-workers of Bryant." [*Id.,* ¶6]. Benton states: "Bryant's job as a Warehouse Coordinator was to keep the warehouse orderly. On one Monday, LaChance jumped on Bryant about things being out of order, even though Bryant had been on vacation when the mess was made. LaChance never confronted those employees responsible for the mess." [*Id.,* ¶7]. Benton states, "LaChance would check and measure the rows of materials each morning when Bryant was the coordinator. He [sic] never saw LaChance doing this after Bryant was removed." [*Id.,* ¶8].[3] He also states that Bryant was later moved to the reblend crew and "tried to help move things around. He was told not to touch things." [*Id.,* ¶11]. He states, "I believe

---

[2] This statement is directly contradicted by the record. Bryant was not "removed" from the Warehouse Coordinator position, but rather bid on and was awarded the position of Temporary Operator II. *See* Fact #21, *infra.*

[3] Benton also makes the hearsay statement, "I was told by other employees that they witnessed LaChance yell and curse at Bryant." [*Id.,* ¶9]. He also states, "Brant was removed from the Warehouse Coordinator position, and the Coordinator duties were given to three younger employees on the reblend crew." [*Id.,* ¶10]. He contends the replacements did not do a good job and "LaChance did not yell at or discipline the three younger reblend workers as he had done to Bryant." [*Id.*].

that Bryant's treatment by LaChance was not based upon Bryant's work performance. LaChance did not treat the reblend crew like he did Bryant. LaChance seemed to have a personal vendetta against Bryant." [*Id.,* ¶12].

15. Johnny Crabtree worked for C.P. Kelco from February 23, 1981 to September 5, 2008, when he retired. [Dkt. #60, Ex. E, ¶4]. He was a coworker of Bryant. Crabtree states, "Bryant was a very hard worker with above average skills." [*Id.,* ¶5.]. Crabtree worked around LaChance but not directly for him. He "observed LaChance to be very pushy and act as a know-it-all toward his men." [*Id.,* ¶6]. Crabtree states:

> LaChance and Bryant did not get along, and argued on several occasions. LaChance treated Bryant less favorably than he did other younger co-workers of Bryant. He singled Bryant out for criticism over other younger co-workers.

[*Id.,* ¶7]. Crabtree further states:

> Bryant's job as a Warehouse Coordinator was to put inventory away and keep things neat in the warehouse. On one week, I saw Bryant do his work as told Monday through Wednesday, and then he took vacation days on Thursday and Friday of that week. The other employees looked it over before Bryant left and saw that it was in order.
>
> LaChance checked every drum while Bryant was gone. LaChance put stickers on the drums that he wanted to be re-moved. He never did this to anyone else. He would nit-pick Bryant. LaChance yelled at Bryant, even though Bryant wasn't there for two days. He never saw LaChance doing this after Bryant was removed.
>
> On one Monday, LaChance jumped on Bryant about things being out of order, even though Bryant had been on vacation when the mess was made. LaChance never confronted those employees responsible for the mess.
>
> I saw and heard LaChance yell and curse at Bryant. I heard LaChance threaten to fire Bryant.

[*Id.,* ¶¶8-11]. Crabtree, like Benton, contends Bryant was removed from the warehouse Coordinator position, and replaced by three younger workers, who did not perform the duties as well as Bryant, but "LaChance did not 'bird dog' them like he did Bryant. LaChance did not yell

or discipline the three younger reblend workers as he had done to Bryant." [*Id*., ¶12]. Crabtree opines that "LaChance seemed to have a personal grudge against Bryant." [*Id*., ¶14]. Further, he states:

> The old management of the Company had a list of older workers that they wanted to get rid of. That management would harass employees and threaten jobs regularly. Now the Company does not say as much to the older workers as before, but the plant is still run by a bunch of younger managers, with the plant manager in his thirties.

[*Id.,* ¶15].

16. After the May 18, 2004, altercation, plaintiff complained to Glidden, then the Human Resources Manager at the Okmulgee facility, that LaChance had cussed him, complained about his work and threatened to fire him. [Dkt. #60, Ex. C., Glidden Affid., ¶5 and CPK/BRYANT.0825, attached thereto]. In response, Glidden spoke to LaChance and arranged a meeting among LaChance, Bryant and two Union representatives. [*Id.*]. During the meeting on May 24, 2004, LaChance explained that he had told Bryant that there was no need for the Warehouse Coordinator role if the job couldn't be done and "apparently, Bryant took this comment as a threat by LaChance." *Id.* Glidden stated, "LaChance and Bryant then discussed the requirements of the position and agreed to act professionally in their dealings with each other." [*Id.*]

17. At no time during or before the meeting did Bryant ever state to Glidden or LaChance that he believed LaChance had discriminated against him due to his age. [*Id.,* ¶6; Dkt. #60, Ex. D., LaChance Affid., ¶5B]. The first time Glidden and LaChance became aware that Bryant had alleged to anyone that he had been a victim of age discrimination was after Bryant filed his first Charge of Discrimination with the Oklahoma Human Rights Commission ("OHRC") in October of 2004. [Dkt. #60-3, Ex. C, Glidden Affid., ¶6; Dkt. #60, Ex. D, LaChance Affid., ¶5B.].

18.  LaChance states he has never written Bryant up, demoted him, cut his pay, placed him on probation, reduced his hours or threatened to fire him and has never directed anyone to take such actions.  [*Id.*, Ex. D, LaChance Affid., ¶15].  Further, he contends he never discriminated against Bryant because of his age or retaliated against him because of alleged complaints regarding age discrimination.  [*Id.,* ¶8].  He states that Bryant is not the only employee he has supervised and "spoken to about job performance."  [*Id.,* ¶4].  He states:

> I have advised other employees, who I believe to be younger than Bryant, of what I believed to be their unsatisfactory performance and my expectations that they need to improve their performance.

[*Id.,* ¶4].

19.  Bryant claims that the three individuals who replaced him were permitted to work 48-60 hours a week "any time they wanted it," while he was only permitted to work overtime "whenever it was in the best interests of the company."  [Dkt. #66, Ex. A, Bryant Dep., 181:25-182:24].  Bryant testified he saw the three (Keith Barnett, Kenny Metcalf and Eddie Brown) working overtime and they also told him they were coming in on weekends and working 12 hours.  [*Id.,* 182:21-184:5].  Bryant testified his bosses (he believes it could have been James Alexander, Patty Van Meter "or whoever the supervisor was on shift that they put me there with, but stated Alexander was the "main one"), forbade him from working overtime as a Temporary Operator II in the warehouse or in reblend.  [*Id.,* 184:6-185:5].  He said sometimes Brown, Barnett and Metcalf would show him their paychecks if they had received a 60 hour paycheck.  [*Id.,* 188:1-19].  Bryant claims that from the time he was given the warehouse coordinator position until March 29, 2010, when he left as a result of his disability, he was not permitted to work 48 hours a week.  Other members of the reblend crew were routinely allowed to work 48

hours a week until he raised his concerns about it; then nobody was allowed to work 48 hours a week.  [*Id.,* 189:20-192:7].

20.  However, CP Kelco's time records for Bryant from January 1, 2004 through mid-November of 2010 do not indicate his overtime hours subsequent to the altercation with LaChance were reduced.  [Dkt. #60, Ex. A, Tony Young Affid., ¶5 and attached time records].  The time records show, instead, that both before and after the altercation with LeChance, Bryant's overtime was sporadic throughout the period of January 1, 2004, to his departure in 2010.  [*Id.*]

## Temporary Operator Position

21.  On June 28, 2004, Bryant bid for another position in the facility by completing a "Job Opportunity Application" for the position of Temporary Operator II on the Warehouse Team.  He was awarded the new job on July 9, 2004.  With the job change, Patty Van Meter ("Van Meter") became his supervisor.  [Dkt. #60, Ex. B., Bryant Dep., 177:7-180:7 and Exs. 12 & 13 to dep.]  Bryant did not incur a change in his rate of pay when he accepted the new position.  [Dkt. #60, Ex. C., Glidden Affid., ¶3].

22.  After plaintiff left the Warehouse Coordinator position, several other employees assumed the responsibilities of the Warehouse Coordinator role.  However, as time passed, LaChance came to the conclusion that the position was not significantly improving operations and, therefore, he decided to eliminate the position.  [Dkt. #60, LaChance Affid., ¶8].

## First Charge of Discrimination

23.  On October 2, 2004, Bryant filed his first Charge of Discrimination with the OHRC against CP Kelco.  In the Charge, Bryant claimed he had experienced age discrimination while working for CP Kelco beginning on the date of the LaChance incident, May 18, 2004.  That

incident, the subsequent assumption of Warehouse Coordinator duties by younger workers, and LaChance's alleged failure to discipline younger workers are the only particulars identified in the first Charge. He did not allege that he had suffered retaliation for complaining about discrimination. [Dkt. #60, Ex. B, Bryant Dep., Ex. 7 thereto.]

## Second Charge of Discrimination

24. On February 12, 2005, Bryant filed an amended charge of discrimination with the OHRC. In the amended charge, he still did not state that he had been a victim of retaliation. However, he added a contention that he had suffered age discrimination in September of 2004 because CP Kelco allegedly failed to provide him with "temporary light duty" at that time, but had placed a younger worker, Kenny Metcalf, on temporary light duty. [Dkt. #60, Ex. B., Bryant Dep., Ex. 4 thereto].

## Temporary Light Duty

25. Defendant asserts that plaintiff did not make a request for temporary light duty in September of 2004. If he had requested "light duty," like other employees and in accordance with CP Kelco policy, he would have been instructed to bring a note from his healthcare provider regarding what, if any limitations he may have had so that CP Kelco could determine whether it could accommodate such restrictions. [Dkt. #60, Ex. C, Glidden Affid., ¶10].

26. Furthermore, based on Bryant's healthcare provider's statement, Bryant became disabled from work on September 7, 2004, and could not have returned to work before September 27, 2004, because his doctor had not released him to work in any capacity during that period. Additionally, when his doctor released him to return to work, Bryant did not need "light duty" because he had no work restrictions at that time. [*Id.,* ¶10; Dkt. #60, Ex. B, Bryant Dep., Exs. 8 & 9 thereto].

27.  CP Kelco employee, Kenny Metcalf ("Metcalf"), was allowed to perform available "temporary light duty" because his doctor released him to work with restrictions and, at that time, CP Kelco had work available for Metcalf that was consistent with his medical limitations. [Dkt. #60, Ex. C, Glidden Affid., ¶10].

### Temporary Reblend Operator II Position

28.  On April 11, 2005, Bryant applied for another position in the facility by completing a "Job Opportunity Application" for the position of Temporary Reblend Operator II on the Packaging Team.  He was awarded the new job on or about April 13, 2005.  [*Id.,* Ex. B, Bryant Dep., 231-33, 235, and Exs. 24 & 25 thereto].[4]

### Third Charge of Discrimination

29.  On July 14, 2006, Bryant filed a third charge of discrimination.  In that charge, he alleged, for the first time, that he had suffered retaliation because of his age discrimination complaints to the OHRC.  He alleged the retaliation first occurred on June 13, 2006, when Van Meter yelled at him and wrote him up for insubordination.  He also alleged that she was part of a larger part of harassment that he had received from management.  [Dkt. #60, Ex. B, Bryant Dep., Ex. 7 thereto].

### Reprimand by Patty Van Meter

30.  Patty Van Meter is 56 years of age.  [Dkt. #60, Ex. E., Patty Van Meter Affid., ¶1]. In 2006, she was Bryant's direct supervisor.  [*Id.,* ¶2].

31.  In June of 2006, Van Meter issued a written reprimand to Bryant for insubordination. Van Meter testified she issued the reprimand because on June 13, 2006, he "kept interrupting and interfering with my discussion with another employee after I had repeatedly asked him to refrain

---

[4] Based on subsequent events, it appears that Van Meter continued as his supervisor in his new position.  *See* Facts ##29-32 below.

from doing so." [*Id.*].  According to Van Meter, the discussion she was having with Bryant's coworker had nothing to do with age or any complaints about age discrimination "but related to concerns expressed to me by another employee, Louise Paterson ('Paterson'), regarding complaints by some of her co-workers that Paterson should not have agreed to perform work that those co-workers believed was outside of her job responsibilities."  Van Meter stated she believes Pateson is currently 60 years of age.  She is still employed by CP Kelco.  Van Meter stated, "Bryant's age had nothing to do with my decision to reprimand Bryant.  Furthermore, at the time that I issued the reprimand to Bryant, I was unaware that he had made any complaints of age discrimination to anyone or that he had filed any complaints with any federal or state agencies regarding discrimination of any kind." [*Id.*. ¶3].

32. However, Bryant , in an affidavit submitted in response to defendant's summary judgment motion, alleges Van Meter asked him several times about what was going on with his age discrimination charge with the OHRC, told him more than one time that his discrimination charge against John LaChance was the topic of the daily management meetings and asked him if he had heard anything more from Laura Donelson, the OHRC investigator on his age discrimination charge.  [Dkt. #66, Ex. G, Bryant Affid., ¶¶3-5].  He states that he spoke directly with Van Meter about the allegations of his age discrimination complaint several times in response to her questions *prior* to the events with her that resulted in his filing of a retaliation charge.  [*Id.,* ¶6]. He also states that he heard Van Meter talking to LaChance regarding the findings from the OHRC investigation, and when they saw Bryant, they quit talking.  [*Id.,* ¶7].

**Fourth Charge of Discrimination**

33. On June 15, 2009, Bryant filed his fourth Charge of Discrimination.  In that charge, he claimed Glidden had retaliated against him for filing discrimination charges with the OHRC

by wrongfully accusing him of committing a safety violation and then sending him home due to the alleged violation. [Dkt. #60-2, Ex. B., Bryant Dep., Ex. 7 thereto].

### Fifth Charge of Discrimination

34.  On October 2, 2009, Bryant filed his fifth charge of discrimination. That charge amended the fourth charge by adding complaints about being placed on probation and Glidden's refusal to expunge a disciplinary action from Bryant's personnel file due to a safety violation by Bryant. Bryant claimed these actions constituted unlawful retaliation. [*Id.,* Ex. 7 thereto].

### Safety Incident

35.  The safety incident referenced by Bryant in his last two charges of discrimination occurred on February 18, 2009. CP Kelco strictly prohibits the practice of throwing barrels from the top of the Fermentation Head House, without roping off the landing area and posting individuals along the ground to make sure that no one walks into the landing area. [Dkt. #60, Ex. C, Glidden Affid., ¶15B]. That afternoon, Adam Walkoviak ("Walkoviak"), Utilities Area Supervisor, reported that while looking out of his office window, he observed 55 gallon barrels tumbling one after the other to the ground from near the top of the Fermentation Head House—a three or four story drop. Although his view was somewhat obstructed so that he could not see who was responsible, Walkoviak reported that he could tell someone was tossing barrels off the building. [*Id.*, Glidden Affid., ¶15C and Walkoviak email to Glidden, attached thereto, CPK/BRYANT.1523].

36. Walkoviak called the shift team leader to notify him so he could put a stop to it. [*Id.*]. The shift leader, Rusty Brown, said Walkoviak told him he could see 55-gallon drums being thrown of the Fermentation Head House; Brown told Walkoviak he would take care of it. Brown called the fermentation control room, Roy Payne answered the phone, and Brown asked him to

go stop whoever was throwing drums from the head house. Later that day, Bryant came into the team lead office and said, "Well I guess you heard that they caught me?" and Brown said, "you talking about throwing the drums off the head house, we can't do that." [*Id.,* CPK/BRYANT.1520].

37. Payne stated that he was working with Operator II's at the Fermentation Head House blending WIP into fermenters. He was in the control room for a break when he was asked to go tell whoever was at the worksite to quit throwing barrels off the fourth story of the Fermentation Head House. He stated:

> When I arrived Duwayne Bryant was there and I asked him if he had been throwing barrels to the ground. He answered affirmatively and I informed him to stoop. All the empty barrels were on the ground at this time. We went back to the control room where Rusty Brown appeared and Duwayne made the comment that he had been caught doing something bad. He admitted to Rusty in my presence that he had thrown barrels to the ground form the fermentation head house level."

[*Id.,* CPK/BRYANT.1529].

38. On March 2, 2009, CP Kelco issued a written warning to Bryant regarding the February 18, 2009, barrel throwing incident and placed him on probation for six months. [Glidden Affid., ¶15G and Ex. 26 thereto, Written Warning].

39. Bryant filed a grievance with the Union over the reprimand and probation. [Glidden Affid., ¶16A and Ex. 18 thereto]. In a meeting among Glidden, Bryant and his Union representative on April 1, 2009, Bryant claimed he had not thrown the barrels and suggested he would have additional information regarding the safety incident but "he had not completed his investigation." [Glidden Affid., ¶16A]. Based on this assertion, CP Kelco agreed to review the matter again. CP Kelco also sent Bryant home and advised him that if it determined he was not being truthful regarding the incident, he would not be paid for the time off work. Glidden

prepared and forwarded to the Union letters dated April 16, 2009 and April 20, 2009. [Glidden Affid., ¶16A and Exs. 32, 33 thereto].

40. On April 3, 2009, CP Kelco provided plaintiff with a list of written questions regarding the safety incident. On April 7, 2009, he returned the questionnaire with his handwritten answers. In response to the question, "Is there any other information you have pertaining to the barrel incident?" Plaintiff responded: "I'm still doing my investigation." [Glidden Affid., ¶16B and Ex. 27 thereto]. Because Bryant's response to the last question suggested that he might have additional information regarding the incident, Bryant was asked to supplement his original response to the question. On April 13, 2009, he supplemented the response, stating: "Not at this time but later could be some with the Unemployment Comm the Union and the Okla Human Rights Comm." [*Id.* and Ex. 28 thereto]. In his responses, plaintiff claimed he did not throw the barrels, he was not present when the barrels were thrown, he did not tell anyone he threw the barrels, and Ron Payne had told him he had "dumped some over on nights, and why he said this I don't know." [*Id.,* Exs. 27, 28].

41. According to Glidden, CP Kelco reviewed the information regarding the safety incident, including information supplied by Bryant, and determined Bryant was responsible for throwing the barrels and was being dishonest by denying that he had thrown them. Therefore, CP Kelco refused to lift the reprimand and probation. Additionally, because the employer believed Bryant had been dishonest, he was not paid for several days he was off work. [Dkt. #60, Ex. C, Glidden Affid., ¶16C and attached statements from Payne, Brown, Sidney McCain, Rohit Datar, Tommy Wittman, Walkoviak, Brett Kelley, Jimmie Lee, Dallas Johnson and Dale Jolliff].

42. Glidden stated that Bryant's age and/or complaints about age discrimination played no role in CP Kelco's decisions regarding Bryant's reprimand and/or suspension related to the safety incident. [*Id.,* ¶16C].

43. Bryant has submitted the affidavit of Timmy Williams. [Dkt. #66, Ex. F]. Williams began working for C.P. Kelco on October 5, 2005, and continues to work for the company to date. [Dkt. #66, Ex. F, Timmy Williams Affid., ¶4]. Like Benton and Crabtree, he was a coworker of Bryant and characterizes him as "a hard worker with above average skills." [*Id.,* ¶5]. Williams states that in February 2009, he also worked with Ron Payne, and witnessed Payne throwing "several barrels off the top level of the Fermentation Head House the night before DuWayne Bryant was accused of throwing barrels off the same location." [*Id.,* ¶6]. He never saw Bryant throw any barrels off the Fermentation Head House. [*Id.,* ¶7].

44. Bryant is not the only employee who has been reprimanded for throwing barrels. Payne received a warning and was also placed on probation when CP Kelco discovered that he had unsafely thrown barrels from a building. [Dkt. #60, Ex. C, Glidden Affid., ¶17]. The Payne barrel throwing incident did not occur on the same day that Bryant threw barrels. [*Id.*]. Glidden stated, "Unlike Bryant, Payne admitted to throwing barrels." The Payne warning, dated April 29, 2009, is attached to the Glidden Affidavit at CPK/BRYANT.1429. [*Id.*].

45. Glidden, LaChance, Van Meter and another of Bryant's supervisors, James Alexander, have all stated in affidavits that CP Kelco did not discriminate against Bryant due to his age nor did it retaliate against him because he complained of age discrimination. [Dkt. #60-3, Ex. C, Glidden Affid., ¶¶3, 6, 9, 10, 12, 16C, 19; Dkt. #60-4, Ex. D, LaChance Affid., ¶¶7, 8; Dkt. #60-5, Ex. E., Van Meter Affid., ¶¶2,3; Dkt. #60-6, Ex. F., James Alexander Affid., ¶2].

46. Bryant, in his deposition, claimed CP Kelco terminated a number of older employees, including individuals named Vance, Frances Beasley and Richard Green. [Dkt. #66, Ex. A, Bryant Dep., 20:1-25, 30:16-24].

## II. Summary Judgment Standard

Summary judgment is appropriate if the pleadings, affidavits and depositions "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Any doubt as to the existence of a genuine issue of material fact must be resolved against the party seeking summary judgment, and the inferences drawn from the facts presented must be construed in the light most favorable to the nonmoving party. *Board of Education v. Pico,* 457 U.S. 8353, 863 (1982).

Nonetheless, a party opposing a motion for summary judgment may not simply allege that there are disputed issues of fact, but must support such assertions by citing to particular parts of the record, including depositions, documents, affidavits or other materials. Fed.R.Civ.P. 56(c)(1). An affidavit used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Fed.R.Civ.P. 56(c)(4). Mere conclusory allegations, without evidentiary support, do not create a genuine issue of fact. *L & M Enters., Inc. v. BEI Sensors & Sys. Co.,* 231 F.3d 1284, 1287 (10th Cir. 2000). [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).

### III. Analysis

### A. ADEA Claim (Count I)

### 1. Burden of Proof/Burden Shifting Process

The ADEA prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment *because of* such individual's age." *Jones v. Oklahoma City Public Schools,* 617 F.3d 1273,1276 (citing 29 U.S.C. §623(a)(1)( emphasis in original). In 2009, the Supreme Court clarified the meaning of the phrase, "because of," as used in the ADEA, in *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167, 129 S.Ct. 2343 (2009). The court held that "the ordinary meaning of the ADEA's requirement that an employer took adverse action "because of" age is that age was the 'reason' that the employer decided to act." *Id.* at 2350. Thus, in order to establish a claim under the ADEA, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Id.* The Tenth Circuit, in the wake of *Gross,* has stated that it is "not the employer's burden to negate any possible contributor role played by age in the challenged adverse action but, conversely, the employee's burden to show that age was the 'but for' cause of the action. *Medlock v. United Parcel Serv., Inc.,* 608 F.3d 1185, 1193 (10th Cir. 2010).

In *Jones,* the court observed that the Tenth Circuit has long held that a plaintiff must prove "but for" causation to hold an employer liable under the ADEA, but "this causal standard does not require [plaintiffs] to show that age was the sole motivating factor in the employment decision." 617 F.3d at 1277. (quotations and citations omitted). "Instead, an employer may be held liable under the ADEA if other factors contributed to its taking an adverse action, as long as age was the factor that made a difference." *Id.* (quotations and citations omitted). "Accordingly, *Gross* does not disturb long-standing Tenth Circuit precedent by placing a heightened

evidentiary requirement on ADEA plaintiffs to prove that age was the sole cause of the adverse employment action." *Id.* at 1278.

The court observed that "[a] more nuanced question is whether *Gross* rendered the *McDonnell Douglas* framework of proving discrimination inapplicable to claims brought pursuant to the ADEA." *Id.* Under *McDonnell Douglas,* the plaintiff may avoid summary judgment by providing circumstantial rather than direct evidence of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). To do so, plaintiff must first demonstrate a prima facie case of unlawful discrimination. *Id.* at 802. If he succeeds at the first stage, the burden of production shifts to the employer to identify a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Once the employer advances such a reason, the burden shifts back to the plaintiff to prove the employer's proffered reason was pretextual. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133,143 (2000).

In *Jones,* the Tenth Circuit held that *Gross* "has no logical effect on the application of *McDonnell Douglas* to age discrimination claims." 617 F.3d at 1279. The court, quoting *Gross,* stated, "the burden of persuasion [n]ever shifts to the party defending an alleged mixed-motives discrimination claim brought under the ADEA. *McDonnell Douglas...*does not shift the burden of persuasion from the plaintiff to the defendant. Rather it shifts only the burden of production. Throughout the three-step process, the plaintiff...carries the full burden of persuasion to show that the defendant discriminated on [an] illegal basis." *Id.*

## 2. Application of *McDonnell Douglas* Burden Shifting Analysis

The parties agree that since plaintiff has presented no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis applies.

### a.  Prima Facie Case

To prove a prima facie case of age discrimination, a plaintiff must show:

1) he is a member of a class protected by the ADEA;

2) he suffered an adverse employment action;

3) he was qualified for the position at issue;

4) he was treated less favorably than others not in the protected class.

*Jones*, 617 F.3d at 1279, citing *Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 531 (10th Cir. 1998).

Although the Tenth Circuit liberally defines the phrase "adverse employment action," a mere inconvenience or an alteration of job responsibilities is not an adverse employment action under the ADEA.  *Sanchez,* 164 F.3d at 532.  Rather, an "adverse employment action" is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Hillig v. Rumsfeld,* 381 F.3d 1028, 1032-33 (10th Cir. 2004).

Defendant concedes plaintiff is a member of a class protected by the ADEA and was qualified for the position at issue, but denies plaintiff suffered an adverse employment action or was treated less favorably than others not in the protected class.  Thus, plaintiff must present some evidence of elements two and four.

Plaintiff argues he suffered an adverse employment action in the form of a reduction in hours and "unfair discipline."

### (i) Reduction in Hours Claim

Plaintiff claims he suffered an "adverse employment action" because after he transferred from Warehouse Coordinator to Temporary Operator II he did not get as much overtime work as

younger employees.  However, "[a] plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination."  *MacKenzie v. City and County of Denver,* 414 F.3d 1266, 1274 (10th Cir. 2005).  Of plaintiff's five charges of discrimination, only the first two allege age discrimination and none allege a reduction in overtime opportunities.  The two age discrimination charges allege: (1) LaChance swore at him and threatened to fire him and did not treat younger employees in like manner and (2) a request for light duty was denied.

Filing a charge of discrimination with regard to a challenged employment practice is a jurisdictional prerequisite to pursuing a claim based on that practice in court.  29 U.S.C. § 626(d); *Haynes v. Level 3 Comm'ns, LLC,* 456 F.3d 1215, 1222 (10th Cir. 2006);  *Martinez v. Potter,* 347 F.3d 1208, 1210 (10th Cir. 2003) ("Each discrete incident of [discriminatory or retaliatory] treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted").  Plaintiff's failure to raise, in any of his five Charges of Discrimination, the claim of age-based discrimination in the assignment of overtime work precludes him from asserting it in this lawsuit.

Moreover, the time records do not support plaintiff's contention that his overtime hours were reduced following his transfer from the Warehouse Coordinator position.  Instead they show that both before and after the LaChance incident and his subsequent transfer, plaintiff only sporadically worked overtime.

Plaintiff cites *Bizzell v. Target Corp.,* 2010 WL 2990010 (W.D. Okla. July 26, 2010) in support of his reduction-in-hours claim. In *Bizzell,* the court denied the employer's motion for summary judgment on plaintiff's reduction-in-hours claim because the employer failed to offer admissible evidence of plaintiff's time records.  2010 WL 2990010, *3.  This case is

distinguishable from *Bizzell* because here, the employer has presented the sworn affidavit of Young attaching Bryant's time records. Those records do not support Bryant's claim that his overtime hours were reduced. Moreover, it is undisputed that Bryant voluntarily changed positions twice after the Warehouse Coordinator position. In *Bizzell,* in contrast, the employee had not changed positions, but her hours had been cut.

### (ii) Unfair Discipline Claim

Plaintiff also claims he was "singled…out [by LaChance] for increased scrutiny and criticism over younger, similarly situated employees who engaged in the same claimed actions as [plaintiff]." [Dkt. #66 at 14]. He cites *Maiahy v. Target Corp.,* 2010 WL 2927365 (W.D. Okla. July 22, 2010), in support of his position.

Plaintiff's reliance on *Maiahy,* however, is misplaced. There, the plaintiff had received a series of unsatisfactory reviews, written counseling and written warnings, which the court concluded were collectively sufficient to establish an adverse employment action. *Id.* at *4. Here, at most, plaintiff received an oral reprimand from LaChance.

The Tenth Circuit has held that a *written* warning is an adverse employment action *only* if it effects a significant change in the plaintiff's employment status. *Haynes,* 456 F.3d at 1224. *See also EEOC v. PVNF, L.L.C.,* 487 F.3d 790, 800 (10th Cir. 2007). Federal antidiscrimination laws do not "set forth a general civility code." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006). "[T]rivial harms," "petty slights," "minor annoyances" and "simple lack of good manners" are not even sufficient to establish an adverse employment action under the more liberal standards applicable to retaliation claims. *Id.* Therefore, the confrontation with LaChance—which resulted in no adverse mark in plaintiff's personnel record—could not be considered an adverse employment action.

The court finds Bryant has not established a prima facie case of discrimination because, with respect to the reduction-in-hours allegation, he failed to exhaust his administrative remedies and the time records do not support the claim. Similarly, the alleged "unfair discipline" by LaChance does not constitute an "adverse employment action," as defined by the Tenth Circuit. Plaintiff has not established a prima facie case of age discrimination. Therefore, the employer is entitled to summary judgment on Count I of his Third Amended Complaint.

## B. Van Meter Retaliation Claim (Count II)

Plaintiff alleges retaliation based on the oral and written reprimands by Van Meter on June 13, 2006, and June 27, 2006.

To establish a prima facie case of retaliation, plaintiff must come forward with evidence "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1202 (10th Cir. 2006).

### 1. Prima Facie Case

Plaintiff's earlier filing of age discrimination charges constitutes protected activity, thus satisfying the first element for establishing a prima facie case of retaliation. Based on his disputed testimony that Van Meter knew about his earlier charges of discrimination prior to Van Meter's reprimand,[5] he has arguably come forward with evidence establishing the third element—a causal connection between the protected activity and the adverse action. However, he has not established he suffered a materially adverse action. As previously noted, a *written*

---

[5] Defendant asserts that the temporal proximity between the protected activity and the alleged retaliatory conduct is not sufficiently close. *See Haynes,* 546 F.3d at 1228. Plaintiff filed his charges of discrimination October 2, 2004 and February 17, 2005. The reprimand occurred in June 2006.

warning is an adverse employment action *only* if it effects a significant change in the plaintiff's employment status. *Haynes,* 456 F.3d at 1224. "[T]he plaintiff must show that a reasonable employee would have found the action materially adverse such that they might be dissuaded from making a charge of discrimination." *Somoza v. Univ. of Denver,* 513 F.3d 1206, 1213 (10th Cir. 2008). The test is an objective one. *Id.* at 1214. "The court must focus on the 'materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position' so as to 'screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Shaver v. Rottinghaus Co., Inc.,* 2011 WL 3880893, at *14 (D. Kans., Sept. 2, 2011) (quoting *Jencks v. Modern Woodmen of Am.,* 479 F.3d 1261, 1265 (10th Cir. 2007)). The fact that a plaintiff was *not* dissuaded from continuing to pursue to remedy what he perceives to be acts of discrimination is relevant to the materiality inquiry. *See Somoza,* 513 F.3d at 1214.

There is no dispute that Van Meter orally reprimanded plaintiff on June 13, 2006 and followed it up with a written reprimand on June 27, 2006. However, plaintiff has identified no significant change in his employment status as a result of the reprimand. Additionally, plaintiff filed a charge of discrimination with regard to the alleged retaliation by Van Meter less than three weeks after the written reprimand, further demonstrating that the reprimand did not deter him from pursuing his ADEA remedies. *Id.* Thus, the Van Meter reprimand could not, under the law, be considered a material adverse action.

Plaintiff has failed to establish a prima facie case of retaliation based on the Van Meter reprimand, because he has no evidence the reprimand constituted a materially adverse action.

## C. Count III (Barrel Tossing Incident)

### 1. Prima Facie Case

Plaintiff has presented evidence meeting the requirements for the first two elements of a prima facie case of retaliation:  first, that he engaged in protected activity and second, that he suffered an adverse employment action.  The issue, then, is whether he has shown a causal connection between the protected activity and the adverse employment action.  Defendant argues the temporal proximity between the most recent protected activity (filing of a retaliation charge in July 2006 concerning the June 2006 Van Meter reprimand) and the disciplinary action against Bryant for the barrel tossing incident of February 18, 2009, was too remote to establish the causal connection.  *See Haynes,* 546 F.3d at 1228.  Clearly, a lapse of almost three years undermines plaintiff's causation argument.  The court finds plaintiff has failed to establish a prima facie case.  Additionally, as set forth below, CP Kelco has provided a legitimate, nondiscriminatory reason for the adverse action, and plaintiff has failed to rebut the stated reason.

### 2. Defendant's Proffered Legitimate Reason for Adverse Action

Glidden stated in his affidavit that CP Kelco prohibits the practice of throwing barrels from the top of the Fermentation Head House without roping off the landing area and posting individuals along the ground to make sure no one walks into the landing area.  Further, after an investigation, Glidden determined that plaintiff was responsible for throwing the barrels, and had been dishonest regarding the matter.  As a result, plaintiff was reprimanded, put on probation and not paid for several days he was off at work.   This evidence suffices to establish a legitimate reason for the adverse action against plaintiff.

### 3. Pretext

Plaintiff contends the employer's stated reason for the adverse action is pretextual, and the action was actually in retaliation for plaintiff's filing of discrimination and retaliation charges.[6] In support of this position, plaintiff asserts Payne was not disciplined as severely as plaintiff for the same conduct. Also, plaintiff has claimed he did not throw the barrels and has insinuated Payne was responsible for the February 18, 2009, incident.

The Glidden affidavit establishes, however, that during the course of the investigation of the February 18, 2009, incident, Payne admitted throwing barrels off the top of the Fermentation Head House, apparently the night before the incident involving plaintiff. Payne was warned and placed on probation, but did not lose any pay. The Payne barrel-throwing incident did not occur on the same day as the Bryant barrel-throwing incident, and, in fact, Payne was sent to stop Bryant from throwing barrels. Further, unlike Bryant, Payne admitted throwing barrels.

Defendant proffered a legitimate business reason for the disciplinary action against plaintiff. Based on the lack of temporal proximity between his protected activity and the disciplinary action and plaintiff's failure to come forward with any material evidence to the contrary, the court concludes no reasonable jury could conclude the employer's stated reason was pretextual. Defendant is entitled to summary judgment on Count III of plaintiff's Third Amended Complaint.

---

[6] Bryant's coworker, Parker, stated Glidden had told him he wanted to run Bryant off. Parker's affidavit, however, does not disclose when and in what context Glidden made such a statement. Even if the statement is construed as an admission against interest by Glidden and CP Kelco, its conclusory nature is insufficient evidence that Glidden disciplined Bryant as retaliation for Bryant's much earlier charges.

**D. *Burk* Tort Claim**

Plaintiff was never discharged from CP Kelco.  Instead, he stopped working due to his health and does not believe he will ever return to work due to disability.  Because he was not discharged, he cannot bring a public policy claim.  *Davis v. Board of Regents for Okla. State Univ.,* 25 P.3d 309, 310 (Okla. Civ. App. 2001) (citing *Burk v. K-Mart,* 770 P.2d 24, 29-30 (Okla. 1989).  Therefore,  CP Kelco is entitled to summary judgment on the *Burk* tort claim set forth in Count IV of the Third Amended Complaint.

**IV. Conclusion**

For the foregoing reasons, defendant CP Kelco's Motion for Summary Judgment [Dkt. #60] is granted.

ENTERED this 14th day of February, 2012.


Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma